Good morning, Your Honors. Todd Burns, Federal Defenders on behalf of the We're dealing with a juvenile female, right? We are. Okay. I don't intend to use her complete name, so I don't see that there's any insecurity unless the court prefers to have the courtroom completed. Let me ask you something. She was prosecuted as a juvenile offender, right? She was. Okay. And then she's sent to, what's the name of that program again? Phoenix House. That's right. Right. Okay. And this is a very good place, I understand. And where is she now? Funny you should ask that. Do you know something that I don't know you know? Well, it's not what I know, Phoenix House. It's what you think I know. Well, I'm somewhat reluctant to say, but she has graduated. She went to another drug treatment program. There have been some events in between, including she was put in an adult halfway house program that I strongly objected to. It was a bad place for her. About a week into being there, they gave her all of her medications and told her to go see her psychiatrist. She bounced from one place to another with mistakes in communication as to where she was going to go. She ended up eating quite a bit of her medication and attempting suicide. She spent about a week on a ventilator, about three weeks after that in a psychiatric ward. Then she went into another treatment program. She has since recently graduated from a treatment program as a former dependent child. She is eligible for assisted living type programs, subsidized housing, but there is no program open for her right now. And there were few options as to where she could go, so she's actually presently staying with my wife and I. What did you say? She's presently staying with my wife and I at our home. That's nice. No, I just, I mean, I wondered why it seemed to me like she got a very good deal. I don't know if she could have done any better with being handled as a juvenile, going to the Phoenix house. Well, that may be true. I don't know what you're appealing about. Well, that may be true that she needed some help and that she got more help than she was getting. Now, she could have gotten that help to begin with being a dependent if her social worker had taken steps to get her that help. You know, I don't want to get into a lot of the recriminations and acrimony here, but she could have gotten that help anyway. But now she does have a juvenile adjudication that she has committed a felony. Now, I'm still kind of in a struggle with her probation officer, although I haven't brought it to head because it seemed like a battle not worth fighting yet, as to whether or not that's something that she has to advise potential employers. Her probation officer has routinely told her if she applies for a job or, you know, if she's going to living circumstances, her probation officer makes her reveal that or the probation officer reveals it herself. It's not real helpful for, you know, going to school and getting a job. Now, I think that's a wrong position. I think she doesn't have a criminal conviction. She doesn't have to admit it. But that's something that we're fighting about that has real implications. She has an adjudication of being a juvenile delinquent. And, you know, God forbid she gets in other trouble, that could come back to haunt her as well. So that's why, you know, that's the way to expunge that, isn't there? No, I don't believe in the Federal system that there is. So my plan was to focus on the second issue I raised. And the reason for that is because the Court issued an order about three weeks ago with respect to 542. And so I just want to point out factually to begin with, there is no dispute but that Agent Jokic, the agent who was allegedly assaulted here, was engaged in a drug investigation and a drug stop or seizure. He was not doing his immigration duties at all. There is no dispute as to that. Neither counsel discussed 542 under the Homeland Security Act. They're put together. And I appreciate the order because it had me focused on some things that I missed. And so I used 542 as sort of a launching point. 542 directs the executive to submit a plan as far as reordering some of these functions that were on INS and other federal agencies. And basically I looked at the plan that was submitted, which is attached to the annotations to 542, and it pretty much mirrors what the statute said as far as setting up the Department of Homeland Security. And interestingly, 6 U.S.C. Section 251 transfers immigration enforcement functions to a certain part of DHS. Section 211 and sequential transfers customs functions to a certain part of DHS. And Section 271 and sequential transfers citizenship and immigration services to a certain subsection of DHS. So importantly, they've separated immigration and customs as being different functions that are being looked after here. But they were put under the same umbrella, were they not? Well, DHS, yes. But they've separated them under different undersecretaries. And then consistent with the transfer of authority in early 2003, DHS created new regulations to deal with all the sorts of things it needed to deal with that potentially were dealt with in regulations before. And going back and looking at those regulations, some of which I've cited, Part 103 of 8 CFR is specifically titled Powers and Duties. And then 103.1B indicates that a Border Patrol agent is an immigration officer and that such an immigration officer has authority to exercise powers and duties as specified by, it says the Act, that's referring to the Immigration and Nationality Act. And this chapter. And then later, Part 287 of that same chapter refers to the heading is Field Officers, Powers and Duties. And if you go through sort of the part of 287, it refers to various duties such as patrolling the border, enforcing immigration laws. And when you come to 287.5C4, which is the main regulation that I focused on, it talks about authority with respect to warrantless search and seizure. And it refers to 8 U.S.C. Section 1357. It refers to it by using the INA designator, which is, I believe it was 287. I forget. But it was referring to specifically that statute, 1357, specifically to the section dealing with warrantless arrests. And it mirrors exactly 1357. So the DHS has taken this authority and has incorporated 1357's requirements into its regulations and has referred to them a couple of times as under subsections and chapters, saying powers and duties. And what it says is that for an agent to make an immigration officer, which a Border Patrol agent is, to make a warrantless arrest, there has to be reasonable grounds that a felony is being committed. Well, presumably that's probable cause, because probable cause is required to make an arrest. The Border Patrol agent or the immigration officer must be performing duties relating to enforcement of the immigration laws. That clearly wasn't going on here. There must be a likelihood that the person will escape if you don't make the warrantless arrest. Well, they had air cover of all sorts of agents in the area. I don't think that showing was made either. And the immigration officer must be appropriately certified. Well, that was never addressed either. But most importantly, when you look at 1357 and what Congress is trying to accomplish here, the agent was not engaged in performing his immigration functions. And a case that I cited, Perkins, which is out of the Western District of Texas, talks a little bit about the legislative history in 1990 when Congress added these specific provisions with respect to warrantless arrest. And one of the things that Perkins points out is that this is on page 1122 of Perkins, which is 166 F. Supp. 2nd. And, again, it's cited in my brief at 1116. It quotes Congress as saying that the amendment, the legislative history is saying the amendment to 1357-85 grants immigration INS officers, what are now DHS border patrol officers, general arrest authority, but such officers will have general arrest authority only if at the time of the arrest the officer was performing immigration duties. The primary purpose of this restriction is to ensure that INS will not be diverted from its primary duty, the administration of the immigration law of the United States. Congress has made clear in 1357 and made clear in the legislative history that the duty of immigration officers, such as border patrol agents, is the enforcement of the immigration laws. Now, while they're doing that duty, certain things happen. Then they have ancillary duties, but they do not have general law enforcement authority. Customs agents may. Customs agents certainly would have the authority to make the type of stop or arrest here. But border patrol agents have specifically been prohibited that authority. So I don't know how it's possible to say that someone who is doing something that he's specifically prohibited from doing is performing his official duties. And, you know, it's consistent with this Court's approach in the Amaya case, which I know is from a number of years ago, 1957, when they looked at whether an immigration officer was performing, the Court looked at whether an immigration officer was performing his official duties, looked at 1357. It's consistent with the Sixth Circuit Whip case, which I cited, the same sort of thing. It's even consistent with one of the cases that the government relies on, which is out of the Second Circuit, and it's called Sun. And in that case, the individual who was, I guess, a dishwasher in a restaurant, immigration officers came in and started asking questions about immigration status. An assault occurred, and the person said, well, they didn't have just cause to be asking about my immigration status. And the Court looked at 1357 there and said they were going in looking to see if people had proper papers. That was consistent with their official duties under 1357, and so if an assault occurred after that, then they're performing their official duties. So even that case relied on by the government supports my position. You know, they rely on this test that the Second Circuit adopted, you know, is the person doing their job or engaged in a frolic. Well, the frolic thing is nowhere in the plain language. Official duties is in the plain language, and this Court has never adopted that test. But if you look to the first part of it, is the person doing their job? Well, someone who is doing something, an agent that's doing something Congress has prohibited, I submit, is not doing their job. So it doesn't pass that part of the helix or the Second Circuit test, even if that were to be applied. And I think that's... He only went out there because one of the officers, or the officer that pulled alongside of him when they were parked, as I recall, recognized the driver of the car as someone that he'd, oh, encountered or arrested or whatever for 500 pounds of marijuana. That's correct, and apparently there had been a, I think this is in the record, apparently there had been a previous bust or near bust earlier in the morning involving marijuana, and so they had some suspicion that there may be some drug activity in the area. In this road. In the area, not specifically in the road where the stop and the seizure occurred. It's in 1357 and the commensurate regulation isn't met, too. But certainly the agents were not engaged in their immigration enforcement duties. And if you look at the testimony of the use of force expert that I submitted at trial, who testified at trial, you know, he talked a lot about plainclothes drug apprehensions and the dangers because people who are dealing in drugs are worried that they may be subject to violence, so that there's a cauldron of potential trouble there. And it would make good sense to make sure that the people who are engaged in those sorts of stops and seizures are well trained to deal with that sort of situation, and we don't have any indication that the Border Patrol agents are. We do have an indication that Congress didn't want them to be engaging in that sort of activity generally. And so I think that that's just another common sense basis for saying that, look, if Congress tells you you can't do something and you go and do it, you are not performing your official duties. And I will reserve the rest of my time for questions. So how is she getting along? She's doing very well. Cleans the house, does the dishes. It's great. I mean, I admire you for that. Well, some people think I'm crazy, but you didn't really have any other options, so. I don't think you're crazy. I think you're doing good things. George Hardy, Assistant U.S. Attorney. Turning straight to the 542 issue that you've raised, the Reorganization Act and the implementing plan that was submitted by the Bureau of Customs and Border Protection, and under that 2003 plan, it says the Bureau will contain the resources and missions relating to borders and ports of entry of the Customs Service, the INS, including the Border Patrol. So as of 2003, they're all part of the same Bureau, and they all join together in having the same resource, joining in using the same resources, and they, more importantly, have the same missions. They have the same mission. They have separate heads, and they were not consolidated. Well, correct. There is a separate chief of the Border Patrol, as I understand it, and there is a separate. But they respond and are directed by a common commissioner. And I believe it's the Commissioner of Customs, who now reports to the Undersecretary of the Department of Homeland Security, who is actually over the Border Patrol at this point in the reorganization. But if I can sort of... Can the Border Patrol people, can they stop folks other than when there's checkpoints, because they have a they think there might be drugs in the vehicle? Your Honor, I think the answer to that question is yes, when they're within the area of the border. And here we're within two miles of the border. What you're saying is all these different outfits are fungible, huh? Are they replaceable? Well, not entirely, Your Honor. But what I'm saying is that I think we're really talking... They went out there because they thought there were drugs. Mr. Agent Jokic... Here, I've seen this guy, and I remember that he got busted or I busted him or whatever it was for 500 pounds of marijuana. And that's what started the whole thing. I want to back up a little bit and say the issue we're dealing with is a 111, assault on a federal officer. The issue was whether or not he was performing his official duties. Now, what did this... Is Agent Jokic on the job? Is he doing his job? What happened that day? He went to work to the Boulevard Border Patrol Station. He's part of the intel unit. And the record shows that there was testimony of the supervisor at the neighboring Campo intel unit. And what do they do? They're involved with intercepting any contraband that comes across the border. They work with others. They work with sheriffs, they work with DEA, they work with Customs. The supervisor at the Campo station had been involved in many narcotics smuggling stops in the past. So Agent Jokic, doing his job, is told, get down there to Boulevard and help those people who are on the border. Who are following this car. He was doing his job at the time. What did he do? He came up behind the stopped car. The driver had run out the door, was heading for the hills, and one other Border Patrol agent went after that driver. And what was he doing pursuant to his responsibilities as a law enforcement agent at the border? He went to check out the driver, and that's when he got assaulted. Now, the case of Helleser from the Second Circuit is the one that Mr. Burns says this court has never adopted. That's the case which was also adopted in the Lopez that came to the following test for whether or not the officer is employed in the performance of his duties under 111. It's whether or not he's engaged in the performance of his duties within the scope of what the agent is employed to do. The test is whether the agent is acting within the compass or is engaging in a personal frolic of his own. It's been adopted by the Second Circuit. It's been adopted by the Fifth Circuit. And it's actually been cited by a panel of this court, including Judge Thompson, who was on that panel in the Greenberg case. Unpublished decision, so it's not been an adopted rule, but it has been cited by this case. The defendant places a lot of reliance on the Amaya case, which is the Ninth Circuit case involving the border patrol agent that went into the bar, if you remember, where there was a fight, and there was a discussion about whether or not he had the legal authority to go in there and ask questions of those present at the bar. And Mr. Burns argues that that establishes the rule that 1357 establishes the parameters of the duties of a border patrol agent. And I submit that that case doesn't say any such thing. It certainly looks at 1357 in the facts of that case, but it doesn't rely on that as the test for whether or not he was performing his duties. Rather, the Amaya case cites a Second Circuit case, which is where the Hellaser case comes from, and says, the entry of the officer into the building and any search made there was, quote, in the course of the investigation and germane to the performance of the duties of the officers while bona fide acting under the color of authority. That should be the test of whether or not an agent who is doing his duty should be protected under the terms of 1811. That should be the test about whether or not this particular defendant should be charged with a 111, not whether or not there's a specific statutory authority for a search or an arrest, which might, if they're outside the scope of that, lead to suppression of evidence, if they're trying to prosecute a marijuana case, or suppression of some other evidence, or recognition that an arrest is illegal. That certainly didn't happen in this case. There was no prosecution of the marijuana with respect to this particular defendant, so it didn't come up. But that would be a context in which the 1357 regimen might make some sense. But in the context of an assault on a Federal officer, that's not the test. 542, I think, answers the question, because these Border Patrol agents do have the mission of customs, and under Title 19, under the customs mission, it's protecting the border from illegal activity, from contraband coming in. So this agent was on the job, doing his job, when he was greeted by a knife by this defendant. He was performing the duties of a customs agent. He was performing his duties. He was not outside the scope of his duties. He was told to be there, and he was doing his job. The scope of his duties included acting as a customs agent. In this case, yes. They're consistent duties. Well, let me ask you this, because, you know, we don't see too many juvenile cases. But I thought that if you're prosecuted as a juvenile offender, that you can get your judgment. I was trying to remember the answer to that question, since you brought it up earlier. There was a possibility of expungement, but I'm not sure that it exists. And I think in the past, if it was a prosecution under the Young Adult Offender Act, which no longer exists, I think, there wasn't a possibility of expungement. But since the juvenile adjudication has its own protections, then I don't think there is a possibility of expungement. But I can't give you the absolute answer on that. I can't answer that question for you, Your Honor. I'm sorry. I don't know. I'm sorry. I don't know. I'm sorry to let you down on that one, Your Honor. If there are any other questions about this issue or the prior issue, thank you very much. Certainly customs and immigration functions are both under the umbrella of DHS, but the statute makes quite clear that there are subsets to the umbrella. And the regulations make quite clear, consistent with 1357, that warrantless arrest authority and duties are quite limited for an immigration officer, which a border patrol agent is. Judge Pregerson, you asked a very interesting question. Can the border patrol just be making drug stops whenever it wants, willy-nilly? And the government's answer is yes. And I believe the answer is clearly no under 1357. They have limited authority in that respect. Yet the border patrol, I think, agrees with government counsel that they can make those stops whenever they want, based on suspicion of drug activity. And they do it all the time, in violation of 1357, which makes it important that the court make clear to them that that's just not right. That's against the law. As far as suppressing evidence seized under those circumstances, several courts have made clear that even though there might be a violation in that context, suppression is not the appropriate remedy. The government counsel said, well, the test should be if they're on the job. Well, that's not what the statute said. Congress didn't say if they're on duty or if they're on the job. Congress said if they're performing their official duties. And again, certainly something that is not authorized, that is specifically barred, it's really difficult to say how that is an official duty. May I have just a few more moments? I see the red lights. I'll just skip to the last question, which is, again, back to the expungement. I believe government counsel is right that the Youth Offender Act did have requirements, certain specifications for when something could be expunged, but I don't believe that's in effect anymore and those guidelines weren't followed here. Finally, with respect to whether or not Ms. Boros needs to disclose this conviction to people when she's looking for a job, again, I believe it's a juvenile adjudication. It's not a felony conviction. It's a sealed record. She shouldn't have to disclose it. But the prosecutor in this case, the district court, was firmly of the opinion that it was a felony and she had to treat it as such, and the probation officer is acting in that manner as well. Now, I haven't confronted that issue yet because I try not to pick fights that don't need to be picked, but one day that may well, that likely is going to be an issue that will need to be confronted head-on. Okay. The matter is submitted and the court will recess until tomorrow morning at 9 a.m. All right.
judges: Pregerson, Nelson, Thompson